# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
**UNITED STATES OF AMERICA** )
)
    **v.** )    **CR. NO.  04-10248-RCL**
)
**RICHARD W. GOULD** )
_____)

## DEFENDANT'S SENTENCING MEMORANDUM
_____

Defendant, Richard W. Gould (hereinafter "Gould"), submits this memorandum, by and through counsel, to address the issues that will be raised during the sentencing phase of his case. For the reasons set forth herein, Gould submits that applying the factors set forth in § 3553(a)(2) to the individual circumstances of this case warrants a sentence that does not exceed forty-eight (48) months of imprisonment.

I.    <u>HISTORY AND CHARACTERISTICS OF MR. GOULD</u>.

Richard W. Gould, age 27, is the eldest of two children born to Richard and Eleanor Gould. Gould has one sibling, his sister Erin, who is 25. Gould's roots in Massachusetts, generally, and Peabody, specifically, run very deep. He is a life long resident of Peabody, attended Peabody public schools and graduated from Peabody Veterans Memorial High School in 1996. As the letters submitted on his behalf demonstrate (see letters attached hereto as <u>Exhibit A</u>), Gould excelled in sports growing up and was devoted to his family and friends, and especially his little sister Erin.

However, as detailed in the Presentence Report and the letters submitted herewith, Gould's childhood was difficult. At the tender age of 10 years, he was hit in the eye with a hockey puck which required many stitches. Apparently, he developed a severe case of Psoriasis

from this injury.  Moreover, as a result of this condition, Gould began to withdraw from playing sports and, by high school, stopped playing altogether.

During his childhood, Gould also was the victim of verbal abuse resulting from his father's long-standing depression.  Indeed, Gould and his mother both report that Gould's father has been hospitalized for depression three times:  twice at Balpate Hospital, in Georgetown, MA and once in Salem Hospital, in Salem, MA.

Also, when Gould was 15 and his sister, Erin was 13, Erin was kidnapped and raped. Erin writes in her letter to the Court that her whole life was stolen from her that evening and that her family was devastated.  According to Erin, Gould was "deeply hurt" because as her big brother, he felt responsible for her and felt that he failed her by not protecting her.  Eventually, the individual responsible for abducting and raping Erin was caught and prosecuted and sentenced to a prison term of five (5) years, but was paroled after serving three and one-half (3.5) years.

One of the first signs that Gould was headed in the wrong direction arose when he delayed going to college despite having the intellectual capacity to do so.  Indeed, while on pretrial release in this matter, as verified in the Presentence Report (¶¶ 75-77), Gould attended courses at Salem State College and North Shore Community College from November 15, 2004 through December 2005 and achieved 3.19 Grade Point Average at North Shore Community College.

The second sign that indicated something was amiss was his abuse of substances. According to Gould, he did not become a "big drinker" until the age of 21.  However, he had been drinking since high school.  Eventually, his drink of choice became vodka.  He also experimented with marijuana.  However, by the time he was 22 or 23, he began using cocaine on

a regular basis, and at least twice monthly. He also began using steroids and other illicit drugs.

The third sign that Gould was heading in the wrong direction was that for the first time in his life he was involved in criminal behavior. Specifically, after graduating from high school, he was involved in an altercation in Swampscott, MA that resulted in criminal charges that were ultimately continued without a finding and subsequently dismissed. Finally, the most obvious sign that something was wrong was Gould's conduct in this case.

However, Gould is more fortunate than many of the individuals who come before the Court. He is still a young man with most of his life before him. He has the support and love of his immediate family and his extended family as demonstrated by the letters submitted herewith. He is extremely remorseful for his conduct in this case. <u>See</u> Letters of relatives attached hereto as <u>Exhibit</u> A. He has no prior drug arrests or convictions. He has never been in treatment for substance abuse and would clearly benefit from said treatment. He has demonstrated during his pretrial release that he has the discipline to be a law-abiding citizen by complying with all the conditions of his pretrial release, including a curfew, periodic drug testing, maintaining a work and school schedule, and being "extremely respectful" toward his Pretrial Services Officer, Thomas M. O'Brien. Also, since the commencement of his incarceration in January, 2006, he has had no disciplinary problems.

In short, as more fully set forth below, Gould's intelligence, character, discipline and first offender status indicate that he is a likely candidate for rehabilitation, that he is at a low risk to reoffend, and will likely become a productive law-abiding citizen after his release.

II.    <u>NATURE AND CIRCUMSTANCES OF MR. GOULD'S OFFENSE</u>.

On January 30, 2006, Gould entered a plea of guilty to Counts One and Seven of the Indictment in the above-captioned matter. Count One charges him with a conspiracy to possess

with intent to distribute and to distribute oxycodone in violation of 21 U.S.C. § 846. Specifically, the Indictment charges that beginning in or about November 2003[1] and continuing thereafter until on or about June 29, 2004, Gould conspired with co-defendant, Christopher Alviti, to possess with intent to distribute and to distribute oxycodone. Count Seven charges that on or about June 30, 2004, he knowingly and intentionally possessed with intent to distribute oxycodone in violation of 21 U.S.C. § 841(a)(1).

III.   DRUG QUANTITY.

   A.   Undisputed Quantity.

   At the time of Gould's plea, undersigned counsel noted that Gould was entering a plea of guilty to Counts One and Seven to the extent it charged him with possession with intent to distribute the 502 eighty (80) milligrams tablets seized at the time of his arrest. Undersigned counsel further indicated that he would be requesting an evidentiary hearing on the government's allegations that he should be held responsible for additional amounts of OxyContin for sentencing purposes.

   B.   Disputed Quantities.

   In the Presentence Report (¶¶41-43), the Probation Office takes the position that Gould should be held accountable for the 502 tablets found at the time of his arrest, plus an additional 6,000 tablets based on his alleged admission that he was receiving 500 to 1,000 tablets every two

---

[1] The date November 2003 is significant in this case because on November 1, 2003 U.S.S.G. § 2D1.1(c), or the Drug Quantity Table, was amended in two respects applicable to the 80 milligram tablets involved in this case. First, Note (B) of the "Notes to Drug Quantity Table" was changed to read that "The term 'Oxycodone (actual)' refers to the weight of the controlled substance itself, contained in the pill, capsule, or mixture." Prior law was based on the weight of the pill without consideration of the quantity of the controlled substance within the pill. Second, the Application Note 10 to § 2D1.1, or the Drug Equivalency Tables, was amended by striking "1 gm of Oxycodone = 500 gm of marihuana" and inserting "1 gm of Oxycodone (actual) = 6700 gm of marihuana". See Amendment 657. The net effect of changing the computation method and increasing the marijuana equivalency by 13.4 times (from 500 gm to 6700 gm), results, on average, of an increase of four (4) offense levels. See Exhibit B (Quantity Computation).

weeks for six months for a base offense level of 34.

The government, on the other hand, now takes the position, based entirely on the uncorroborated self-serving statements of Gould's co-defendant, Christopher Alviti, that Gould should be held accountable for 20,000[2] tablets because Alviti claimed, among other things, that he received between 200 and 400 OxyContin tablets on approximately 150 occasions from Gould for a period of one to two years.[3]   If the Court adopts the government's position, Gould's base offense level would be a 36.

   C.    Defendant's Position on Disputed Quantities.

Gould concedes that he should be responsible for the 502 tablets seized at the time of his arrest.  However, Gould objects to any quantity in excess of the 502 tablets, because the basis for said calculation is based on Gould's alleged post-arrest statements and Christopher Alviti's post-arrest statements.  Specifically, Gould submits that neither his post-arrest statements nor Alviti's post-arrest statements are sufficiently reliable for the Court to reach a "reasoned estimate" on drug quantity.  See United States v. Rodriguez, 162 F.3d 135, 149 (1st Cir. 1998); United States v. Santos, 357 F.3d 136, 141 (1st Cir. 2004).  Indeed, even the government concedes that Gould's post-arrest statements are not credible.  See Government's Sentencing Memorandum, p. 5 ("Gould was not truthful during his post-arrest statements.").  Thus, whether the Court concludes that Gould's post-statements were not truthful, as alleged by the government, or unreliable, they should not be used to calculate drug quantity in this case.  If the Court finds that Gould is only

---

[2] Originally, when Alviti was attempting to get "points" from the government, he claimed that he had purchased more than 30,000 tablets from Gould.  However, he subsequently recanted that unsubstantiated allegation and now claims the amount to be 20,000 tablets.

[3] During his proffer on July 19, 2004, Alviti initially indicated that was approached by Richard in 2002 (see ¶ 6), he also claimed to be in the business of selling OxyContin "a couple of years" (see ¶ 8) and, later in the interview, he claimed that he used OxyContin as a some means of income for approximately one year and that he received all of the drugs through Richard (see ¶ 8).

responsible for 502 tablets, his base offense level would be 26.

Another way to calculate the drug quantity attributable to Gould in this case is based on all of the conduct that can allegedly be proven by a preponderance of the evidence.[4]  If the Court finds that Gould was Alviti's supplier of all the quantities sold by Alviti in this case to Agent DiTullio and the original Unnamed Cooperating Witness, as claimed by the government, then the Court can further find that Alviti sold 849 eighty (80) milligram tablets between December 2003 and June 2004.[5]  In addition, as conceded above, 502 tablets were seized at the time of Gould's arrest.  By focusing on the number of pills actually sold during the course of the conspiracy alleged in this case, instead of crediting post-arrest statements that are suspect at best, the Court's reasoned estimate will be on a firmer factual footing.  Thus, Gould submits that the Court can find that a "reasoned estimate" of the total number of 80 mg tablets sold by Gould to Alviti during the course of the conspiracy was 1,351 tablets resulting in a base offense level of 30.

On the other hand, if the event the Court finds that Gould's post-arrest statements credible, then Gould submits that the Probation Office's calculation of 500 tablets "every two weeks" (see ¶41) is actually incorrect because, according to Agent DiTullio's report, Gould said 500-1,000 "every few weeks", which phrase Agent DiTullio place in quotes in his report.  A calculation of 500 tablets every "few weeks" reduces the total number of tablets to 4,000 tablets [6 months (24 weeks) divided by 3 (every few weeks) equals 8 deliveries or 4,000 tablets]

---

[4] Gould submits that the Due Process Clause of the Fifth Amendment requires proof beyond a reasonable doubt of any fact that increases Gould's sentence beyond what can be lawfully imposed on the basis of facts admitted by him.  See United States v. Kandirakis, 2006 WL 2147610 at **32-35 (D. Mass. 2006).  However, because United States v. Yeje-Cabrera, 430 F.3d 1, 23 (1st Cir. 2006), held that a preponderance standard is sufficient, Gould relegates this argument to a footnote to preserve his appellate rights.  However, Gould requests the Court to make both preponderance findings and reasonable doubt findings on every factual issue that increases his sentence beyond the 502 tablets admitted during his plea hearing.

[5] Defendant notes that Alviti made post-arrest statements to the effect that Gould was his only supplier during the time period involving the undercover buys.  However, as Probation pointed out in the PSR, Alviti gave a different story prior to his arrest.

instead of Probation's calculation of 6,000 tablets [24 weeks divided by 2 (every two weeks) equals 12 deliveries or 6,000 tablets].

In addition, Gould submits that the Probation Office double counted when it added the 502 tablets seized on June 30, 2004, to the estimated 6,000 tablets instead of including them within the 6,000. Thus, if the Court finds that Gould post-arrest statements are credible, and adopts defendant's position that he is responsible, at most, for 4,000 tablets during the six month period prior to his arrest inclusive of the 502 tablets seized at the time of his arrest, then his base offense level would be 32.

With respect to the government's allegation that the Court should accept the uncorroborated self-serving word of Christopher Alviti, the short answer is that even if Mr. Alviti testifies, his testimony should not be credited by the Court. Indeed, as the reports attached to the government's sentencing submission indicate, Mr. Alviti has demonstrated from the outset of this case that he was looking to make "points" in exchange for his "cooperation". Moreover, his statements prior to his arrest regarding his supplier are inconsistent with his post-arrest statements. In addition, he understood that the more weight he attributed to Gould in his post-arrest statements, the more "points" he would score with the government. Also, he understood that the weight he attributed to Gould could not be used against him personally.

In addition, Alviti's claim that Gould was his only supplier during the period he sold to Agent DiTullio has never been corroborated. Indeed, despite the use of a wiretap and global positioning monitoring, the government was never able to corroborate that Gould supplied Alviti at any time other than the June 30, 2004, transaction involving 502 tablets.

Moreover, Alviti's claim that Gould supplied him with OxyContin approximately 150 times is simply incredible considering the additional facts that Alviti's residence was being

monitored surreptitiously before and after a number of the transactions with Agent DiTullio.  See Reports of Surveillance attached hereto as Exhibit C.

Last, but certainly not least, Alviti's post-plea pre-sentencing antics, including drug use on the eve of his sentencing, indicates conclusively that his word should not be credited by the Court.  Rather, the Court should conclude, as the Probation Officer concluded, that because the government's drug calculation position is based entirely on the uncorroborated self-serving and inconsistent statements of Alviti, it is not worthy of any credit whatsoever.

In sum, Gould submits that his total offense level based on the quantity of OxyContin involved in this case should be in a range from 26 through 30, depending of the Court's factual findings.  However, assuming that the Court finds that Gould is responsible for more than the 502 pills seized at the time of his arrest, Gould submits that the most reliable estimate in this case is the quantity that actually changed hands during the course of the conspiracy, or 1,351 tablets, resulting in a base offense level of 30.

IV.    OBSTRUCTION OF JUSTICE AND ACCEPTANCE OF RESPONSIBILITY.

In its sentencing memorandum, the government asserts that Gould should receive a two-level upward adjustment pursuant to U.S.S.G. § 3C1.1 (obstruction of justice guideline).  In addition, the government asserts that Gould is not entitled to an acceptance of responsibility adjustment.  The Probation Office does not agree with the government's position.  Gould submits that neither contention by the government has merit.

A.    Defendant's Position on Government's Obstruction of Justice and Acceptance of Responsibility Contentions.

In United States v. Booker, 543 U.S. 220, 239-240, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court held that judicial determinations of fact not found by a jury or admitted by the defendant to increase sentences under the Federal Sentencing Guidelines

violated the Sixth Amendment.  Thus, as a threshold matter, what the government suggests in its memorandum runs counter to the holding in Booker.  Specifically, Gould submits that an obstruction of justice enhancement violates the Sixth Amendment because it will result in a sentence more severe than the facts admitted by the defendant during his plea hearing.  Thus, the Court should deny the government's position because it is expressly prohibited by Booker.

However, assuming the Court considers § 3C1.1 on an advisory basis, Gould notes that there are two pre-Booker First Circuit cases that affirmed an obstruction of justice enhancement; however, both cases involved trial testimony, not testimony at a suppression hearing.  See United States v. D'Andrea, 107 F.3d 949, 958 (1st Cir. 1997); United States v. Reynoso, 336 F.3d 46, 50 (1st Cir. 2003); accord, United States v. Dunnigan, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); but see United States v. Fox, 393 F.3d 52 (1st Cir. 2004) reversed on other grounds, ___ U.S. ___, 125 S.Ct. 2949, 162 L.Ed.2d 864 (2005).

Moreover, to the extent that prior First Circuit case law was based on the Supreme Court's holding in Dunnigan, the Booker Court expressly recognized that, after Booker, the reach of Dunnigan is limited.  Booker, supra at 240.  Thus, while the Court did not overrule Dunnigan because there may be cases where the enhancement applies and the sentence is within the range authorized by a jury's verdict, the government's suggested use of the obstruction enhancement in this case is exactly the harm that Booker sought to remedy.  Specifically, the government is contending that the Court should find facts that increase Gould's sentence beyond that authorized by his guilty plea.  Whether advisory or not, to the extent such a finding would increase Gould's sentence, it would violate both the spirit and holding of the Booker Court.

Moreover, none of the cases cited above, discussed or mentioned the Supreme Court's holding in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 987, 19 L.Ed.2d 1247 (1968),

which held that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt.  Id. at 394.  Nevertheless, the government is now suggesting that this evidence should be admitted against him to increase his sentence.  Interestingly, in Simmons, the Court found what the government is suggesting intolerable.  Indeed, the Court noted that it was "intolerable that one constitutional right should have to be surrendered in order to assert another."  Id.  Yet, that is exactly the situation in which Gould was placed in this case. Specifically, in this case, Gould was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination.  Simmons holds that Gould was entitled to testify in support of his motion to suppress without waiving his Fifth Amendment privilege.  Gould submits that the rationale in Simmons is applicable in this case and thereby prevents the Court from using Gould's testimony against him where he did not otherwise waive his Fifth Amendment privilege, and where, as the Court may recall, undersigned counsel specifically indicated that Gould was taking the stand pursuant to the protection set forth in Simmons.

Finally, before applying the obstruction enhancement, pre-Booker law required the Court to make a specific finding on whether Gould gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  Dunnigan, supra at 94.  In this case, the Court has not made any such finding and, it is notable that the government has not argued that the standard has been met in this case. In addition, the Court may recall that Gould testified that he did not "recall" being informed of his Miranda rights and did not "believe" that he was informed of his Miranda rights.  See Affidavit in Support of Defendant's Motion to Suppress, ¶ 6.  Moreover, the main thrust of his

testimony and his argument before the Court was that the police did not cease their questioning after he asserted his right to counsel.

Finally, even though the Court ultimately found the government's witnesses more credible than Gould, it does not follow that at the time he testified he did so with a willful intent to provide false testimony.  Indeed, it is more likely that his testimony was the result of confusion, mistake or faulty memory based on his mistaken belief (and counsel's for that matter) that he asserted his right to counsel and therefore did not voluntarily waive his right to remain silent.  Moreover, the fact that the Court chose not to credit his testimony does not further establish, without some further evidence of intent, that at the time he testified he did so with a willful intent to provide false testimony.  Thus, Gould submits that the <u>Dunnigan</u> standard has not been satisfied in this case.  Accordingly, for all of the above reasons, the government request for an obstruction enhancement should be denied.

The government's acceptance of responsibility stands on even shakier grounds.[6]  Indeed, if the obstruction enhancement is rejected by the Court, then the government's only remaining argument is that because Gould is asserting his right to contest the drug quantity in this case, he has not accepted responsibility.  The government's argument is legally absurd and runs counter to both the Due Process Clause and federal sentencing law and, therefore, should be summarily rejected.

Thus, a three-level reduction pursuant to § 3E1.1(a) and (b) should be applied in this case, reducing Mr. Gould's requested base offense level of 30 to a total offense level of 27. Since Mr. Gould's also has zero criminal history points, he qualifies for Criminal History

---

[6] The government has not indicated whether it will make a motion to decrease Mr. Gould's total offense level one-level pursuant to U.S.S.G. § 3E1.1(b) if the Court concludes that Mr. Gould has accepted responsibility in this case.

Category ("CHC") of I, which results in a guidelines range of 70-87 months. However, for the further reasons set forth below, Mr. Gould submits that he should not receive a sentence of imprisonment that exceeds four years.

V.    A FOUR-YEAR SENTENCE OF IMPRISONMENT FOLLOWED BY A THREE-YEAR PERIOD OF SUPERVISED RELEASE IS MORE THAN SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE FEDERAL SENTENCING PURPOSES SET FORTH IN 18 U.S.C. § 3553.

In the Sentencing Reform Act of 1984, Congress directed the Sentencing Commission to assure that the purposes of sentencing set forth in 28 U.S.C. § 3553(a)(2) (just punishment, deterrence, incapacitation, and rehabilitation) were met. After Booker, pursuant to § 3553(a), judges must impose sentences sufficient but not greater than necessary to achieve the statutory purposes of sentencing after considering the circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the need to avoid unwarranted disparities, and the need to provide restitution. See 28 U.S.C. § 3553(a). Gould submits that a four-year sentence of imprisonment followed by a three-year period of supervised release is both a reasonable and defensible overall result under the circumstances of this case. See United States v. Thurston, 456 F.3d 211, 215 (1st Cir. 2006)

A.    A Four-Year Sentence Of Imprisonment Followed By A Three-Year Period Of Supervised Release Is Sufficient To Serve The Purposes Of Sentencing.

Pursuant to 18 U.S.C. § 3553(a)(2), any sentence imposed by the Court must reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. 18 U.S.C. § 3553(a)(2)(A). Any sentence must also afford adequate deterrence to criminal conduct and protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2)(B)-(C). Finally, any sentence must provide Gould with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(D).  Gould submits that a 4-year sentence of imprisonment followed by a 3-year period of supervised release is "sufficient, but not greater than necessary," to comply with these sentencing purposes.

Specifically, ordering a 4-year sentence followed by a 3-year period of supervised release will reflect the seriousness of the drug offense involved in this case, will promote respect for the law and will provide just punishment for the offense.  Said sentence will also adequately deter Gould and others from future criminal conduct.  Said sentence will also protect the public from further crimes by Gould for the entire 7-year period he is incarcerated and on supervised release. Finally, a 4-year sentence of incarceration followed by a 3-year period of supervised release will allow Gould to continue the rehabilitation efforts he has begun since his arrest.  Specifically, during his incarceration, he can continue the college-level studies he has begun and participate in a comprehensive drug treatment program.  Also, during the period of his supervised release, he will be closely monitored to ensure that he re-enters the work force and become a law-abiding and productive member of the community.   Since the ultimate goal of sentencing is rehabilitation, a 4-year sentence followed by a 3-year period of supervised release will be sufficient, but not greater than necessary, to rehabilitate Mr. Gould.

Indeed, it is submitted that a sentence of imprisonment that is longer than four years will actually impede Gould's rehabilitation.  Gould is 27 years old.  At the time he committed the offense at issue he was 25.  Since his arrest in June 2004, Gould has demonstrated that he can be a law-abiding citizen as evidenced by his satisfactory compliance with the terms of his pretrial release.  If Gould receives a 4-year sentence of imprisonment, he will have the opportunity to be released at age 30.  He will then be subject to 3 years of supervised release.  During these three years he can be reintegrated into the community, find stable employment, perhaps get married

and even have children.  The point is that while he is under supervised release, he will have the opportunity to completely rehabilitate himself.

    B.      A Four-Year Sentence Of Imprisonment Followed By A Three-Year Period Of Supervised Release Is Sufficient To Achieve The Purposes Of Sentencing When Sentencing A First Offender.

The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal record.  This philosophy, which can be derived directly from the guidelines Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend.    As such, they are deserving of reduced punishment.

Through 28 U.S.C. § 994(j), Congress incorporated the "first offender" philosophy into statutory law and the sentencing guidelines when it Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense…."

In 2004, the Commission reported that in fiscal year 1992, more than 49% of federal offenders were first offenders; in fiscal year 2001, the more than 40% (42.2%) of federal offenders were first offenders.  See *Recidivism and the First Offender* at 4 (May 2004) (hereinafter "*First Offender*") available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.  As a group, first offenders are more likely to be involved in less dangerous offenses and their offenses involve fewer indicia of culpability, such as the use of violence or weapon, no bodily injury and acceptance of responsibility.  Id. 9-10.   They are also more likely than offenders with criminal histories to have a high school diploma and to be employed.  Id. at 6-11.  Most importantly, research has

found that offenders are most likely to recidivate when their sentence is straight prison time, as opposed to probation or split sentences.    See *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines* at 13 & Exhibit 12 (May 2004) available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

However "first offender" status is defined[7], the rate of recidivism (including reconviction, rearrest or revocation) for first offenders is 11.7%, which is significantly lower that the rate of 22.6% for offenders with one criminal history point, or that of 36.5% for offenders with two or more criminal history points. *First Offender,* supra at 13-14.  Even more interesting, the rate of reconviction is also much lower.  Indeed, offenders with zero criminal history points have a reconviction rate of 3.5%, those with one point have a reconviction rate of 5.5% and offenders with two or more points have a reconviction rate of 10.3.  Id. at 13-14, n. 25, 26 & 27.

Thus, Mr. Gould's first offender status makes it likely that his rate of recidivism is very low.  Moreover, other factors such as his age at the time of sentencing, race, educational attainment, sustained employment during the year prior to his sentencing, his compliance with the conditions of this pretrial release, and his abstinence from illicit drugs during the year prior to his incarceration further demonstrate that a long prison sentence is unnecessary to serve the purposes of sentencing in this case.  Indeed, the Commission's own research has found that the lengthy sentence will only increase the likelihood of his recidivism which clearly is counterproductive. *See Measuring Recidivism*, supra at 13 & Exhibit 12.  Accordingly, a 4-year sentence followed by a 3-year period of supervised release is sufficient to achieve the purposes of sentencing when sentencing a first offender.

---

[7] Whether the status "first offender" is defined as individuals with a zero criminal history points, individuals with a Criminal History Category I, or individuals with no prior convictions, Gould qualifies as a first offender.

VI.   THE ADVISORY GUIDELINES ARE GREATER THAN NECESSARY AND DO
      NOT ADEQUATELY TAKE INTO CONSIDERATION MR. GOULD'S FIRST
      OFFENDER STATUS.

    A.   Uncharged Relevant Conduct Combined With The 2003 Amendment To U.S.S.G.
      § 2D1.1(c) Substantially Increases Mr. Gould's Sentence In This Case.

As noted in footnote 2 above, the most recent amendments to the U.S.S.G. § 2D1.1 (c)

(Drug Quantity Table and Drug Equivalency Tables) have, once again, made punishment more

severe.  Moreover, the only justification given by the Sentencing Commission for increasing the

equivalency of one gram of OxyContin from 500 kilograms of Marijuana to 6700 kilograms of

marijuana (or 13.4 times) was proportionality.  However, Gould submits that proportionality

cannot, by itself, justify an increase of four (4) offense levels between prior law and current law

for offenses involving 80 milligram tablets.[8]

Indeed, the Sentencing Commission does not explain why the sale of 80 milligram tablets

should be treated more harshly that 10 milligram tablets.  Similarly, the Sentencing Commission

does not explain why, as a matter of sentencing policy, it is necessary to treat individuals selling

10 mg tablets differently from individuals selling 80 mg tablets or how treating them differently

serves sentencing purposes.   Rather, the Sentencing Commission's proportionality rationale is

apparently based on a simplistic and narrow view that individuals selling 80 mg tablets should

spend more time in jail than individuals selling 10 mg tablets.[9]

Had Gould been prosecuted under the former guideline and his total offense level was

determined to be 27, his low end sentencing range would be 24 months shorter than current law

(46 months vs. 70 months).  Moreover, under the current advisory guidelines, as the total offense

---

[8] As calculated in Exhibit B, given the possible drug quantity calculations in this case, current
law results in a 4-level increase from prior law.

[9] The Sentencing Commission does explain how the 500 to 6,700 equivalency increase was
calculated.  Specifically, it was attempting to keep the sentence for sellers of 10 mg tablets approximately
the same as prior law.

levels increase, so does the disparity between the sentencing ranges from prior law. Thus, a total offense level of 29 under current law after subtracting 4-levels would equal a total offense level of 25 under prior law which would result in a sentence that is 30 months longer (87 vs. 57), on the low end of the guideline range, than prior law.

When this harsher law is coupled with uncharged relevant conduct, it is clear that Gould's potential sentence under the advisory guidelines is greater than necessary to serve the purposes of sentencing. Compare U.S. v. White, 240 F.3d 127, 136 (2d Cir. 2001) (court may depart downward where findings as to uncharged relevant conduct substantially increases sentence) and cases cited.

B.    The Quantity-Driven Advisory Guideline Is Unjust In This Case.

Thirty-one percent of judges surveyed in 2002 listed drug sentencing as "the greatest or second greatest challenge for the guidelines in achieving the purposes of sentencing," with "73.7 percent of district court judges and 82.7 percent of circuit court judges rating drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses. See U.S. Sentencing Commission, *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 52 (2004)(hereinafter "Fifteen Year Report") available at http://www.ussc.gov/15_year/15year.htm.

By elevating the impact of quantity to the exclusion of offense circumstances and offender characteristics pertinent to personal culpability, the advisory guidelines overstate the seriousness of the offense even from a pure "just desserts" perspective. Id. at 50 (quantity a "particularly poor proxy for the culpability of low-level"). Quantity-driven rules mandate "inequity" and "excessive uniformity" by "requiring that different cases be treated alike." See U.S. Sentencing Commission, *Report of the Drugs/Role Harmonization Working Group* at 51, 60

(Nov. 10, 1992)(hereinafter "1992 USSC Drug Report"). The rules make arbitrary distinctions among offenders, creating a false precision. Fifteen Year Report at 50. Quantity is often "opportunistic" and can result in "inequity and unfairness." 1992 USSC Drug Report, <u>supra</u> at 51, 60. Manipulation of sentencing factors by prosecutors and police remains a "significant source of continuing disparity in the federal system." Fifteen Year Report at 82.

In this case, the government is seeking a quantity level that is ten (10) times the level attributable to Gould's co-defendant Christopher Alviti. Moreover, the government has requested the Court to sentence Gould to the maximum penalty allowed by law – 20 years imprisonment. Moreover, unlike Mr. Alviti, who has a prior drug offense on his record, Gould may receive a sentence that is substantially longer than Alviti even though Gould does not have a prior drug arrest or conviction.

In addition, if Mr. Alviti testifies during Gould's sentencing, the government is likely to recommend a sentence below Altviti's advisory guideline range resulting in a further inequity in this case even though Alviti and Gould are substantially similar in that they were both managing retail traffic of OxyContin. Clearly, the quantity-driven disparities present in this case is also a defensible justification for giving less weight to the advisory guidelines in this case and more weight to the sentencing purposes set forth in 18 U.S.C. § 3553(b).

C.    The Advisory Guidelines Do Not Adequately Consider Mr. Gould's First Offender Status.

Today, 55% of federal prisoners are serving time for a drug offense. <u>See</u> *The Sentencing Project, Incarceration and Crime: A Complex Relationship* at 7 (2005) available at http://www.sentencingproject.org/pdfs/incarceration-crime.pdf. Moreover, over 50% are in Criminal History Category I, and at least 83% had no weapon involvement (as in this case). Fifteen Year Report at 54-55.

Recent research by the Sentencing Commission has found that minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism, which the guidelines do not take into account.  See *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score,* p. 15-16 (January 2005) (hereinafter *Salient Factors*) available at http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.   Yet, time and time again, the Sentencing Commission has ignored this clear Congressional intent and has made policy choices that have resulted in longer and longer sentences for first offenders.   Indeed, the advisory guidelines prohibit a departure below the applicable range for CHC 1.   See U.S.S.G. § 4A1.3(b)(2).

In the guidelines Chapter Four introductory commentary, the Commission admits that "while empirical research has shown that other factors are correlated highly and with the likelihood of recidivism, e.g., age and drug abuse, for policy reasons they were not included here at this time."   Moreover, the Commission further promises to "review additional data insofar as they become available in the future."   Presumably, this additional data will permit the Sentencing Commission to reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process as mandated by 28 U.S.C. § 991 (b)(1)(C).

However, at present, the only offender characteristic included in the calculation of the guideline range is the aggravating one of criminal history.  No other offender characteristics have been added even though the Commission's research demonstrates that various factors including gender, age at the time of sentencing, race and ethnicity, employment history, educational attainment, marital status, abstinence from drug use are all factors that impact upon recidivism rates.   Rather, offender characteristics remain discouraged factors and, thus, ensure that the

advisory guidelines result in sentences that are greater than necessary to serve the purposes of sentencing and do not adequately consider Gould's first offender status. Because the advisory guidelines do not adequately take into consideration Gould's first offender status, the Court should decline to follow their rigid application as an exercise of its discretion or depart downward to a sentence of 48 months pursuant to U.S.S.G. § 5K2.0 (allowing for departures for mitigating circumstances not adequately taken into consideration by the Sentencing Commission).

VII. <u>CONCLUSION</u>.

In conclusion, Mr. Gould submits, by and through undersigned counsel, that a 4-year sentence of imprisonment followed by a 3-year period of supervised release is "sufficient, but not greater than necessary," to comply with these sentencing purposes set forth in 18 U.S.C. § 3553(a)(2). Accordingly, Mr. Gould requests the Court to impose said sentence in this case. In addition, Mr. Gould requests that the Court make the following recommendations to the Bureau of Prisons that: (1) He is allowed to participate in the 500-hour Comprehensive Drug Treatment Program authorized by 18 U.S.C. § 3621; (2) He is allowed to serve his sentence in a Federal Prison Camp; and (3) He is designated to a facility in either the Northeast or Mid-Atlantic Region to facilitate family visits during his incarceration.

Respectfully submitted
By Defendant,
RICHARD W. GOULD
By his attorney,


   /s/ Scott P. Lopez
Scott P. Lopez
Law Office of Scott P. Lopez
24 School Street, 8th Floor
Boston, MA  02108
(617) 742-5700



Dated:  September 15, 2006



<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 15, 2006.


   /s/ Scott P. Lopez
Scott P. Lopez